IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| MUNICIPAL ELECTRIC AUTHORITY OF GEORGIA | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CIVIL ACTION FILE NO. |
| JEA | ) ) | _____ |
| Defendant. | ) ) ) | |

## COMPLAINT FOR DECLARATORY JUDGMENT
## AND BREACH OF CONTRACT

This lawsuit arises from a Power Purchase Agreement ("PPA") that supports the ongoing construction of Units 3 and 4 (the "Additional Units") of the Alvin W. Vogtle Electric Generating Plant in Waynesboro, Georgia ("Plant Vogtle"), which has been undertaken by four power providers in Georgia: Plaintiff Municipal Electric Authority of Georgia ("MEAG Power"), the Georgia Power Company ("Georgia Power"), Oglethorpe Power Corporation ("Oglethorpe") and the City of Dalton, Georgia ("Dalton") (collectively, the "Co-Owners"). MEAG Power's ownership is structured as three separate projects: one to sell power to the municipalities it serves ("Project M"); one to sell to PowerSouth Energy Cooperative ("Project P"); and a third to sell power to Defendant Jacksonville Energy Authority ("JEA") ("Project J"). Sales to PowerSouth and JEA are each governed by a Power Purchase Agreement ("PPA").

Certain recent disclosures of unanticipated costs by Georgia Power have triggered a vote among the Co-Owners as to whether to continue the construction of the Additional units or cease construction. That vote is scheduled for September 24, 2018.

JEA has demanded that MEAG Power vote to discontinue construction, although MEAG Power has duties to PowerSouth and to its participant cities and cannot base its vote solely on

JEA's perceived interests. Despite the fact that there has been no vote yet and not all the facts are known, JEA has indicated a clear intent to breach its contract, abandon its obligations, undermine MEAG Power's ability to perform, and attempt to force MEAG Power's hand in the vote. JEA has already commenced taking actions designed to undermine and disrupt MEAG Power's internal process and the Co-Owner vote, and to force termination of construction of the Additional Units. In correspondence with MEAG Power, JEA has clearly stated that it believes the PPA is unenforceable and it intends to immediately exit the PPA.

In addition to casting doubt on the Project J PPA, JEA's actions are breach of its contractual obligations under the PPA, both because they breach JEA's duty to cooperate with MEAG and because they effectuate an anticipatory repudiation of the contract. MEAG Power therefore respectfully asks the Court for declaratory judgment as to the rights and obligations of the parties and injunctive relief preventing further such breaches.

Without such relief, MEAG Power and the 49 Georgia communities who participate in MEAG Power projects face serious and irreparable injury, including, potentially: the inability to finance and complete construction of Vogtle Units 3 and 4, declaration of payment default as to loans backed by the U.S. Department of Energy ("DOE"), an increase of expense in financing, and diminishment of and severe harm to MEAG Power's access to credit.

## PARTIES, JURISDICTION AND VENUE

1.      Plaintiff MEAG Power is a public corporation and instrumentality of the state of Georgia. MEAG Power was created by the Georgia General Assembly in 1975 to acquire or construct, and to operate and maintain, electric generation and transmission facilities. MEAG Power's headquarters are located at 1470 Riveredge Parkway NW, Atlanta, Georgia 30328. MEAG Power's projects benefit 49 communities in Georgia, which are called "Participants." The Participants are the cities of Acworth, Adel, Albany, Barnesville, Blakely, Brinson, Buford, Cairo,

Calhoun, Camilla, Cartersville, College Park, Commerce, Covington, Crisp County, Doerun, Douglas, East Point, Elberton, Ellaville, Fairburn, Fitzgerald, Forsyth, Fort Valley, Grantville, Griffin, Hogansville, Jackson, LaFayette, LaGrange, Lawrenceville, Mansfield, Marietta, Monroe, Monticello, Moultrie, Newnan, Norcross, Oxford, Palmetto, Quitman, Sandersville, Sylvania, Sylvester, Thomaston, Thomasville, Washington, West Point, Whigham, and Crisp County. These Participants encompass a service area population of 634,000 Georgia citizens.  Each Participant is a Georgia resident.

2.     JEA is a publicly-owned electric, water, and wastewater (sewer) utility and an independent agency of the City of Jacksonville, Florida. By service population, JEA is the eighth (8th) largest municipal utility in the United States. JEA's principal place of business located in Jacksonville, Florida.  Each member or participant in JEA is a Florida resident.

3.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1).  Plaintiff MEAG Power and Defendant JEA are citizens of different states and the amount in controversy exceeds the jurisdictional minimum of $75,000.

4.     This Court also has jurisdiction under 28 U.S.C. § 2201 (Declaratory Judgment Act).

5.     Venue in this District is appropriate because JEA subjected itself to the jurisdiction of this Court by executing the contract at issue, the Power Purchase Agreement between Municipal Electric Authority of Georgia as Seller and JEA as Buyer, as amended and restated on December 31, 2014 (the "PPA"), wherein the parties agreed that:

> Each party irrevocably submits to the jurisdiction and venue of the Superior Court of Fulton County, Georgia and the U.S. District Court for the Northern District of Georgia in any dispute arising out of or related to this Agreement, and hereby irrevocably agrees that all claims in respect of such dispute may be heard and determined in the Superior Court of Fulton County, Georgia and the U.S. District Court for the Northern District of Georgia.

49258056v.1

PPA § 1003. (The PPA is attached as **Exhibit A**.) The parties further agreed that "the Superior Court of Fulton County, Georgia or the U.S. District Court for the Northern District of Georgia" are "the sole legally binding forums available to the Parties for resolution of a dispute hereunder." PPA § 801. Those two courts therefore have exclusive jurisdictions for these claims.

## FACTUAL BACKGROUND

### MEAG Power's Reliance on JEA Power Purchase Agreement

6.     MEAG Power is a partial owner of Units 1 and 2 of Plant Vogtle, along with Georgia Power, Oglethorpe, Dalton. Construction for those original two units was completed in 1989. The construction of those units was significantly over budget and delayed, but today those units are MEAG Power's lowest-cost base load generation assets.[1]

7.     As a Co-Owner, MEAG Power had a right to participate in up to 22.7% ownership interest for the construction of two more nuclear units at Plant Vogtle—the Additional Units, dubbed Units 3 and 4.

8.     In 2007, when the Co-Owners were deciding whether to pursue construction of Units 3 and 4, MEAG Power determined that its Participants would need only about 9% of the Project by the time the two units would come on line, rather than the entire 22.7% share that MEAG Power was entitle to take.

9.     Although MEAG Power anticipated that the output of Units 3 and 4 in 2017 would be surplus to the Participants' near-term needs, it was and is duty-bound to efficiently manage its electric supply for decades into the future. MEAG Power anticipated the planned retirement of MEAG Power's existing nuclear units (two Plant Hatch units in years 2034 and 2037) and its

---

[1] "Base load" is the minimum level of demand on an electrical grid over a span of time, for example, one week. Base load power sources are power stations which can economically generate the electrical power needed to satisfy this minimum demand.

Participants' anticipated growing needs in the coming decades, as well as adhering to the cardinal principal of having diversified power generation resources. In order to provide for interim costs while making the power available to its Participants in the future, MEAG Power pursued long term, PPAs with other entities (sometimes referred to as "offtakers") to cover construction costs and the first twenty years of operation. These "hell-or-high-water" contracts specifically provide that the buyer has no right, under any circumstances, to abandon the contract or be relieved of its contractual obligations.

10. The PPAs sought by MEAG Power were designed to commit the offtakers to pay for all of the costs related to their share of power, which they would receive for the timeframe when most of MEAG Power's Participants did not need the Vogtle Units 3 and 4 output. Thereafter, upon the expiration of the offtakers' specified timeframe for taking power, certain Participants would take the power going forward and pay for it.

11. By structuring its potential ownership interest in Units 3 and 4 this way, MEAG Power could take more of an ownership share of Units 3 and 4 than its Participants needed in the relative short term by shifting the cost and benefit of power from Units 3 and 4 to other purchasers until a time when MEAG Power's Participants were anticipated to be in need of a new supply of carbon-free and reliable power.

12. MEAG Power undertook a competitive bidding process to select the offtakers, making clear that only those bidders who agreed to hell-or-high-water contracts would be accepted. After a competitive bidding process, the two winning bidders were JEA and PowerSouth.

13. Thereafter, MEAG Power and JEA (and separately, MEAG Power and PowerSouth) engaged in lengthy contract negotiations, which involved MEAG Power disclosing

49258056v.1

to JEA extensive information, including but not limited to all the pertinent contracts between the Co-Owners pertinent to the construction, management, and operation of Units 3 and 4.

14.     The result of those negotiations was that on May 12, 2008, JEA executed the PPA, committing JEA to pay for 100% of its respective project total annual costs, inclusive of all debt service (principal and interest) and all variable costs for the first 20 years of the Project. (PowerSouth also executed a PPA on May 12, 2008, which terms are substantially similar to the JEA PPA.  PowerSouth has consistently maintained its support for the construction of the Additional Units.)

15.     It was only after MEAG Power obtained JEA's and PowerSouth's agreement to be irreversibly obligated for the obligations of their shares of the Project that MEAG Power agreed to proceed with committing to the other Plant Vogtle Co-Owners that MEAG Power would, in fact, take 22.7% of the total output of Units 3 and 4. That is, MEAG Power expressly relied on the contractual commitments of JEA and PowerSouth when agreeing to proceed with a 22.7% commitment of Units 3 and 4. Had either JEA or PowerSouth not agreed to be obligated for their shares in hell-or-high-water contracts, committing them to pay, for example, for the cost of construction even if Units 3 and 4 never produced electricity, MEAG Power would not have agreed to a 22.7% share and instead would have taken a far smaller share.

16.     Upon obtaining the commitments of JEA and PowerSouth, and further determining the commitments of its own Participants in the first 20 years and thereafter, MEAG Power divided its undivided ownership interest in the Project into three wholly-owned, special purpose limited liability subsidiaries dubbed "Project M" (representing a 33.871% ownership interest or 169.458 MW of nominally rated generating capacity), "Project J" (representing a 41.175% ownership interest, or 206.000 MW of nominally rated generating capacity), and "Project P" (representing a

49258056v.1

24.955% ownership interest, representing 124.850 MW of nominally rated generating capacity).

JEA's rights and obligations under the PPA relate to Project J.[2]

17.     The final ownership structure of the Project is depicted below:

---

[2] PowerSouth's power purchase agreement rights and obligations pertain to Project P; and certain MEAG Power Participants have rights and obligations with respect to Project M.

## Contracted Sales of
## Output of the Vogtle Units 3&4 Projects *
### (all data are approximations)



| Vogtle Units 3&4 |
| :---: |
| Nominally Rated 1,102 megawatts ("MW") Each (2,204 MW Total) |

**Undivided Ownership Interests (Capacity)**

| GPC | OPC | Dalton | MEAG Power |
| :---: | :---: | :---: | :---: |
| 45.7% | 30.0% | 1.6% | 22.7% |
| (1,007 MW) | (661 MW) | (35 MW) | (500.308 MW) |

**Vogtle Units 3&4 Projects**

| Project M | Project J | Project P |
| :---: | :---: | :---: |
| 33.871% | 41.175% | 24.955% |
| (169.458 MW) | (206.000 MW) | (124.850 MW) |

**Contracted Sales of Output and Services of the Vogtle Units 3&4 Projects**

**To 29 Participants**
(Project M Power Sales Contracts)

For the term of the power sales contracts**

**To JEA***
(Project J PPA)

For the initial twenty years of commercial operation of each of Vogtle Units 3&4, respectively, pursuant to a power purchase agreement

**To PowerSouth****
(Project P PPA)

For the initial twenty years of commercial operation of each of Vogtle Units 3&4, respectively, pursuant to a power purchase agreement

**To 39 Participants**
(Project J Power Sales Contracts)

For the period subsequent to the initial twenty years of commercial operation of each of Vogtle Units 3&4, respectively **

**To 39 Participants**
(Project P Power Sales Contracts)

For the period subsequent to the initial twenty years of commercial operation of each of Vogtle Units 3&4, respectively **

49258056v.1

**JEA's Unconditional Obligations Under the PPA**

18.     The PPA requires, in relevant part, that for twenty (20) years, JEA make payments due for all debt service (inclusive of the principal of and interest on each series of bonds and applicable DOE-guaranteed loans), as well as all variable costs related to the Project, whether or not the project is completed, is operating or operable or its output is suspended, interrupted, interfered with, reduced, curtailed or terminated in whole or in part. *See* PPA Article II generally.

19.     The PPA provides specifically that

> [JEA] shall pay its Obligation Share of Plant Vogtle Additional Units PPA Project Annual Costs whether or not the PPA Project Entity's Ownership Interest is completed or is operating or operable, and whether or not its Output is suspended, interrupted, interfered with, reduced or curtailed or terminated in whole or in part, and such payments shall not be subject to reduction, whether by offset or otherwise, and shall not be conditioned upon the performance or non-performance by any party of any agreement for any cause whatsoever.

PPA § 204(g).

20.     JEA's unconditional commitment is reflected in the Recitals to the PPA, wherein the parties acknowledged that

> MEAG [Power] desires to sell the Output . . . of the Plant Vogtle Additional Units PPA Project for the Term of this Agreement, and [JEA] desires to purchase such Output **predicated upon the understanding that the sale of the Output by MEAG [Power] to [JEA] will require [JEA] to assume a proportionate share of the related construction risk**.

PPA Recitals (emphasis added).

21.     In order to fund Project J, the PPA authorizes MEAG Power to, among other things, issue bonds and seek and draw upon DOE loans. *See* PPA Article IV generally. For the first 20 years of debt service, the security for Project J bonds and DOE loans is dependent on the payment

49258056v.1

obligations owed by JEA under the PPA.[3] That is, if JEA were to do anything to undermine or restrict that security, additional needed bonds and loans would become much more difficult and expensive to obtain. To obviate such an occurrence, the PPA provides that

> This Agreement, on which purchasers of PPA Bonds and DOE shall have relied as an inducement to purchase and hold the PPA Bonds and to guarantee the DOE Guaranteed Loan, respectively, shall not be amended, modified, or otherwise altered in any manner except as provided in this Agreement. So long as any of the PPA Bonds or the DOE Secured Obligations are outstanding or until adequate provisions for the payment thereof have been made in accordance with the provisions of the PPA Project Bond Resolution and the DOE Loan Documents, respectively, and no undisbursed commitments remain available under the DOE Loan Documents, this Agreement shall not be amended, modified, or otherwise altered in any manner that will (i) reduce the payments pledged as security for the Debt Service on all the PPA Bonds and as security for the DOE Secured Obligations or extend the time of such payments provided herein, . . ., or (iii) in any manner impair or adversely affect the rights of the owners from time to time of the PPA Bonds or the rights of the DOE Secured Parties pursuant to the DOE Loan Documents.

PPA § 103(b).

22.     The PPA further provides that "this Agreement shall not be terminated by either Party under any circumstances."[4] PPA § 103(a).

23.      JEA also expressly acknowledged that Georgia Power had "sole authority and responsibility for the planning, licensing, design, construction, acquisition, completion, start up, commissioning, renewal, addition, replacement, modification, and decommissioning" of the Project, as well as "sole responsibility for the management, control, operation and maintenance" of the Project. PPA § 601. While the four Co-Owners amended their agreement in 2017 to provide for votes to continue or halt construction under certain conditions, MEAG Power expressly

---

[3] JEA's payment obligations extend only through the first twenty years of operation. PPA § 102.

[4] Section 103 was conditioned solely on the issuance of a DOE Loan Guarantee Agreement, which occurred.

disavowed "any responsibility" and any liability for those matters that fall within "the authority and responsibility" of Georgia Power. *Id*. JEA agreed that "any failure" by Georgia Power to comply with its obligations or otherwise perform, "in whole or in part, shall not excuse [JEA's] performance under this Agreement." *Id*.

24.     Under the PPA, MEAG Power is obligated to "fully and timely comply with its obligations under and in connection with," among other things, "the DOE Loan Guarantee Agreement and the other DOE Loan Documents, including payment of all costs and compliance with all financial obligations in such documents." PPA § 1017.

25.     Finally, the PPA requires that MEAG Power and JEA "**shall cooperate with each other** and with each other's employees and agents by taking all actions necessary to fully effectuate the intent of this Agreement." PPA § 1015 (emphasis added).

### JEA's Commitments Were Repeatedly Affirmed by JEA in a Bond Validation in the Superior Court of Fulton County

26.     In order to raise funds to pay for, among other things, MEAG Power's acquisition, construction and operation of electric generating assets, MEAG Power is expressly authorized by the Georgia Code to issue revenue bonds. O.C.G.A. § 46-3-126(11); O.C.G.A. § 46-3-131. The issuance of such bonds is subject to a validation proceeding in the Superior Court of Fulton County. Such proceedings were had in connection with financing raised for Project J in matters styled *State of Georgia v. Municipal Electric Authority of Georgia*, Civil Action No. 2008CV159297 (validating the issuance of Project J Bonds in the aggregate principal amount of $6,010,140,000), *State of Georgia v. Municipal Electric Authority of Georgia*, Civil Action No. 2009CV179503 (validating a DOE guarantee loan), and *State of Georgia v. Municipal Electric Authority of Georgia*, Civil Action No. 2010CV259189 (validating additional funding for Project J and the December 31, 2014 amended and restated PPA).

49258056v.1

27.     In these validation proceedings, MEAG Power filed a complaint in which the obligations of JEA under the PPA, as amended and revised, were explained (and the PPA itself was attached), and JEA filed an answer in which JEA admitted to the full and unconditional enforceability of the PPA, as amended and revised.  The court, upon this record, validated the bonds and the underlying contracts.

### History of the Additional Units Construction Project

28.     The original contractor for the Project was Westinghouse Electric Co. LLC, which executed a lump sum Engineering, Procurement, and Construction contact for the Project (the "EPC Contract"). Toshiba Corporation, the parent of Westinghouse, executed a guaranty worth as much as $3.68 billion, backing Westinghouse's performance of the EPC Contract.

29.     On March 29, 2017, Westinghouse and certain affiliates filed for Chapter 11 bankruptcy and on July 20, 2017, Westinghouse was authorized to reject the EPC Contract. Georgia Power, as agent for the Co-Owners and who had sole decision-making responsibility with respect to the Project, on the basis of extensive cost-to-complete and cost-of-cancellation analyses, concluded in August 2017 that it was reasonable and prudent to complete the Project, and that the cost to complete would be less than the cost of cancellation.  Using Georgia Power's data on the cost to complete, MEAG Power undertook its own system-level analysis. The conclusion of that analysis was consistent with Georgia Power's decision to complete the Project.  In summer 2017, MEAG Power shared these analyses, as well as all other Project-based information to which it had access, with JEA.

30.     On September 28, 2017, MEAG Power received an additional commitment from the DOE with respect to additional financing for each of its three Vogtle Projects, including the Additional Units.

-12-

31.     In December 2017, Toshiba honored its guaranty of the EPC Contract and paid to the Co-Owners the entirety of the Toshiba Parent Guaranty, totaling $3.68 billion, reducing the total cost of the Project to the Co-Owners.

32.     In January 2018, the Georgia Public Service Commission ("PSC"), after five months of proceedings that involved the intervention of scores of entities (including JEA and MEAG Power), extensive briefing and written testimony, and days of oral testimony and cross examination of and by the parties, the intervenors, and the public, approved Georgia Power's decision to complete the Project in light of the Westinghouse bankruptcy, notwithstanding the delays and increased costs.

### The Co-Owners Re-Negotiated Their Agreement to Provide for Cancellation by Vote

33.     In November 2017, the four Co-Owners amended their agreement. Georgia Power would continue to oversee all aspects of construction, with the other Co-Owners exercising a simple yes-or-no vote as to continued construction in the event of certain triggering events, including certain budget overages. An affirmative vote of 90% or more of the ownership interests (in practice, all Co-Owners other than Dalton) would be required to continue construction.

34.     In August 2018, Georgia Power announced that the budget for the Project would need to be revised upward by over $2 billion, triggering such a vote on continuation. If the Co-Owners vote to proceed with construction of the Project, MEAG Power will need to raise additional financing to pay for its share of the construction costs related to Project J (as well as the other MEAG projects).

49258056v.1

**JEA's Disavowal of the Project
and Its Acts to Undermine MEAG Power's
Relationship With DOE, Others**

35.     In November 2017, JEA's Board of Directors discussed the prospect of selling JEA's assets to a private firm. JEA commissioned a study of such a possible sale. In a report dated February 14, 2018, that study concluded that such a sale "could produce substantial up-front net proceeds to" the City of Jacksonville, and ended with a recommendation that Jacksonville's leaders "evaluate and weigh" the possibility, through "an updated valuation of JEA" and "perhaps an exploratory sale process."

36.     In late 2017 and early 2018, JEA indicated to MEAG Power that it was in favor of discontinuing the project. JEA wrote to MEAG Power in February 2018 that "it is not in the best interests of JEA's ratepayers for the construction of the last and only US nuclear project to continue and for JEA to continue to be bound by the terms of the PPA." The letter ended threatening legal action if a resolution could not be achieved in a February 27, 2018 meeting. Shortly thereafter, however, JEA reaffirmed that it would meet its obligations under the PPA.

37.     Upon the disclosure by Georgia Power of additional project costs in mid-2018, JEA renewed its objections to the Project. In a letter to MEAG Power dated August 17, 2018, JEA's Interim Managing Director and CEO, Aaron Zahn, stated that it was "JEA's position that continuation [of the Project] would violate MEAG's obligations and common law duties owed to JEA," that the case for terminating the Project was "even stronger" than in the fall of 2017, and that "JEA demands MEAG vote not to continue the project."

38.     MEAG Power responded in a letter dated August 24, 2018. MEAG Power reassured JEA that it would take JEA's input on the continuation vote; informed JEA that it was "still in the process of obtaining the necessary data" to complete its analysis of the economics of

-14-

continuation versus cancellation; asked JEA for a copy of the analysis that JEA had independent commissioned in 2017; reaffirmed that it would make no adverse distinctions between JEA, PowerSouth, and the Participants in discharging its responsibilities; confirmed that it had taken all actions available to it to protect all its constituents, including the off-takers; offered to share information as to estimations of the cost of continuing; and stated MEAG Power's willingness to work with JEA to find a solution, while noting that MEAG Power lacked authority to enter into any arrangement that would increase cost or risk for itself or its Participants.

39.     MEAG Power also noted, however, that JEA's demand that MEAG Power vote for cancellation was, in effect, "a demand that we breach our Loan Guarantee Agreements with DOE which would be an event of default under the Loan Guarantee Agreements and would give DOE the option to accelerate all of our DOE debt, which would lead to a cross-acceleration of the bonds issued under our Bond Resolutions related to Project J, Project P and Project M." MEAG Power also warned that JEA's taking that position publicly "could have very deleterious effects," including a domino effect that could profoundly injure PowerSouth, the MEAG Participants, Georgia Power, Oglethorpe, and the City of Dalton.

40.     On September 5, 2018, JEA communicated its position to DOE representatives regarding its strong desire for the Project to be terminated and construction.

41.     On September 7, 2018, DOE sent MEAG Power a letter stating that DOE would "evaluate the impact of JEA's recent statements on MEAG's existing DOE-guaranteed indebtedness within the context of the provisions of the existing loan guarantee agreement with MEAG, and likewise would evaluate the impact of JEA's actions on additional indebtedness."

-15-

42. JEA's actions have already had their intended effect: to interfere with and destabilize MEAG Power's access to credit in order to force MEAG Power's hand in the upcoming vote.

## COUNT ONE
## DECLARATORY JUDGMENT: THE PPA IS ENFORCEABLE

43. MEAG Power restates and incorporates by reference those allegations set forth in paragraphs 1 through 42 above, as if set forth fully herein.

44. MEAG Power is entitled to a declaratory judgment, pursuant to 28 U.S.C. § 2201(a), that the PPA is valid and fully enforceable against JEA.

45. The contract is in all respects valid.

46. JEA has waived, and is estopped from claiming, any defect in the PPA or its formation, or that it is not enforceable in any respect. JEA performed under the PPA for years and never intimated that it was not enforceable. As recently as March 2018 it reaffirmed that it would continue to perform under the PPA. Additionally, the adjudication of the the validity of the PPA in bond validation proceedings was and is conclusive and binding, O.C.G.A. § 46-3-132, and JEA is estopped for that reason as well.

47. MEAG Power is an interested party because its own investments (which are those of its Participants) in the Vogtle Plant project depend in part on JEA fullfilling its contractual obligations to, among other things, make all payments requred under Project J.

48. There is actual doubt as to JEA's performance of its obligations under the PPA. On August 17, 2018, JEA's CEO announced an intent, if MEAG Power does not vote to terminate the Project, to "exit the PPA." JEA argued in its letter that a vote to continue would be a failure on MEAG Power's part "to meet its obligations under the PPA."

-16-

49.     JEA's position and its declaration that it will not abide by the terms of the contract create an imminent threat, because the Co-Owners' vote is scheduled to be held on September 24, 2018.

50.     A substantial, justiciable and actual controversy exists between MEAG Power and JEA, and MEAG Power's contractual rights in the PPA are threatened and uncertain, because JEA has expressed doubt about the continued enforceability of the PPA.

51.     Because JEA has threatened to ignore its obligations under the contract, MEAG Power's interests are at risk if JEA does not perform under the contract. JEA's actions in denying the enforceability of the PPA have already created uncertainty in in MEAG's ability to fulfill its own obligations under the PPA, as well as uncertainty in determining whether to proceed or cancel the Vogtle Project. MEAG has been forced to expend money, time, and attention to deal with that uncertainty. The controversy between the parties is substantial, justiciable, and actual. MEAG Power is entitled to declaratory relief and direction from the Court that MEAG Power has performed under the PPA, that no Co-Owner vote by MEAG Power would be a breach of the contract, and that the entirety of the PPA continues to be fully enforceable against JEA, and will continue to be regardless of the vote.

## COUNT TWO
## BREACH OF CONTRACT: DUTY TO COOPERATE

52.     MEAG Power restates and incorporates by reference those allegations set forth in paragraphs 1 through 51 above, as if set forth fully herein.

53.     Section 1015 of the PPA requires that "[t]he Parties **shall cooperate with each other** and with each other's employees and agents by taking all actions necessary to fully effectuate the intent of this Agreement . . . ." (emphasis added).

-17-

54.     The intent of the PPA, as manifested by the explicit language agreed to by the parties, included that MEAG Power would use DOE loans to finance the Project, and that it should "fully and timely comply with its obligations under . . . the DOE Loan Guarantee Agreement and the other DOE Loan Documents, including payment of all costs and compliance with all financial obligations in such documents."  PPA §§101, 1017.

55.     The intent of the PPA was also that MEAG Power would "not make any adverse distinction in connection with discharging its responsibilities" as between JEA, PowerSouth, and the Participant cities."

56.     JEA's actions are already hindering MEAG Power's ability to carry out those obligations by interfering with its ability to continue to borrow under the DOE program.  An inherent aspect of the PPA is that MEAG Power must be able to access capital markets and other sources of funding in order to satisfy its obligations under the PPA and the Co-Owners' agreements.

57.     JEA's threats to imminently "exit" the PPA, and to take legal action to avoid its obligations under the PPA, hinder MEAG Power's ability to effectuate the intent of the PPA by depriving it of access to sources funding, as well as hindering MEAG Power's ability to fully and timely comply with the terms of its DOE loans.  Such threats, by introducing instability, uncertainty, and risk, are a failure to a cooperate, regardless of whether the threat is carried out.

58.     JEA's actions also hinder MEAG Power's ability to discharge its responsibilities without adverse distinctions among its contractual counterparties.  Indeed, the entire thrust of JEA's recent actions is to attempt to force MEAG Power to *only* take into account JEA's desires and interests and ignore the interests of PowerSouth and the Participant cities.

59.     JEA's actions violate its duties under Section 1015.

-18-

60.     JEA's actions in failing to cooperate in fulfilling the intent of the PPA have already created uncertainty in in MEAG's ability to fulfill its own obligations under the PPA, as well as uncertainty in determining whether to proceed or cancel the Vogtle Project.  MEAG has been forced to expend money, time, and attention to deal with that uncertainty.  If allowed to continue, JEA's actions will cause MEAG Power and its constituents grave, immediate, and irreparable harm that could not be adequately remedied by damages, including, but not limited to, loss of access to credit that is needed in a timely fashion for MEAG Power to avoid defaulting or otherwise breaching its own contractual and statutory duties.

61.     MEAG Power is therefore entitled to declaratory relief stating that JEA's actions are in breach of the PPA, as well as a specific performance order requiring JEA to cooperate with MEAG Power in effectuating the intent of the contract.  The remedy of specific performance is contemplated by the contract, as discussed in more detail below.

## COUNT THREE: SPECIFIC PERFORMANCE

62.     MEAG Power restates and incorporates by reference those allegations set forth in paragraphs 1 through 61 above, as if set forth fully herein.

63.     MEAG Power is entitled to seek specific performance to remedy JEA's breaching conduct.

64.     Under Georgia law, "[s]pecific performance of a contract, if within the power of the party, will be decreed, generally, whenever the damages recoverable at law would not be an adequate compensation for nonperformance." O.C.G.A. § 23-2-130. Here, damages would not be adequate to compensate MEAG Power for JEA's threatened nonperformance. The Plant Vogtle Project is a vast, years-long nuclear power project funded by complex, interlocking investments and commitments. The nature of the business requires MEAG Power not only to receive timely

payments from contractually-commited offtakers like JEA, but to depend on those buyers' full support and continued participation while raising funds in the market in the future. If JEA were allowed to exit the project, notwithstanding the hell-or-high-water contract that it signed, funding for Project J may fail or become difficult to obtain. This would affect the completion of the Project and thereby potentially cause harm to PowerSouth, the MEAG Participant cities, Georgia Power, Oglethorpe, and Dalton, as well as MEAG Power itself.

65.     Furthermore, specific performance is an appropriate remedy regardless of whether the breach is viewed under the UCC or under Georgia common law. O.C.G.A. § 11-1-103 ("Unless displaced by the particular provisions of this title [the UCC], the principles of law and equity . . . shall supplement its provisions."); *Jay Cty. Rural Elec. Membership Corp. v. Wabash Valley Power Ass'n, Inc.*, 692 N.E.2d 905, 913 (Ind. Ct. App. 1998) (noting that "under certain circumstances, specific performance on behalf of the seller has been permitted [under the UCC], as where payment was to be made in a particular manner, and the remedy at law was inadequate") (quoting *Central Illinois Public Service Co. v. Consolidated Coal Co.*, 527 F.Supp. 58, 65 (C.D. Ill. 1981), and 67 Am.Jur.2d § 556)).

66.     Finally, the parties explicitly contemplated specific performance as an appropriate remedy when drafting the PPA. Section 501 of the PPA states that MEAG may seek specific performance in the event of non-payment or "failure to comply with any other covenant, agreement, representation, warranty or obligation of this Agreement." Thus, the remedy of specific performance is not prohibited by, and indeed is expressly contemplated by, the PPA.

67.     MEAG Power thus asks that this Court order specific performance from JEA as follows:

a. That JEA take all Output (as defined in the PPA) made available to it under the Agreement;

b. That JEA use all Output in compliance with the terms of the PPA;

c. That JEA make all payments to MEAG Power as and when required by the terms of the PPA;

d. That JEA not take any actions which will breach its obligations under the PPA, including but not limited to, its obligation to support MEAG's ability to obtain financing for the Project, and its obligations to make all payments required under the Agreement;

e. That JEA cooperate with MEAG Power as required by the PPA in connection with the ongoing and future financing of Project J;

f. That JEA rescind its August 17, 2018 letter;

g. That JEA, in all other ways, act in strict compliance with the terms of the Agreement, and do nothing to threaten the continued financing of the project.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for:

1. A final declaration and decree that the PPA is lawful and enforceable;

2. Grant of the specific performance requested;

3. Entry of the injunctive relief in the form requested;

4. An award of damages;

5. An award of reasonable attorneys' fees, costs, and expenses; and

6. Such other and further relief as the Court deems just and equitable.

Respectfully submitted this 11th day of September, 2018.

                    */s/ Rebecca Woods*

                     Rebecca Woods
Georgia Bar No. 942321
Seth Fortin
Georgia Bar No. 759830
SEYFARTH SHAW LLP
1075 Peachtree Street, N.E., Suite 2500
Atlanta, Georgia   30309-3962
Telephone: (404) 885-1500
Facsimile:  (404) 892-7056

Michael Levinson
(pro hac application to be filed)
SEYFARTH SHAW LLP
233 South Wacker Drive,  Suite 8000
 Chicago, Illinois 60606-6448
 Phone: (312) 460-5000
 Fax: (312) 460-7000

 Attorneys for Plaintiff

49258056v.1